JERRE S. WILLIAMS, Circuit Judge.
This appeal is from a final order of the Bankruptcy Court for the Western District of Texas.[1] It presents a new facet of the question whether, and under what circumstances, a bankrupt’s pension trust may be exempt from the “property of the estate” subject to the reach of the trustee in bankruptcy on behalf of the bankrupt’s creditors. Debtors, Elbert Wayne Goff and Gloria Jane Schadoer Goff, seek refuge for their self-employed retirement (Keogh) plans[2] under Section 541(c)(2) of the new Bankruptcy Code,[3] which exempts property subject to restrictions on alienation which are enforceable “under applicable nonbankruptcy law.” The Goffs argue that this reference to “applicable nonbankruptcy law” was intended to reach broadly by encompassing restrictions on transfer recognized in other federal statutory law as well as traditional state trust law. Their argument presents a question of first impression to this Court. The contention is that Section . 541(c)(2) exempts all pension trusts which are qualified under the Employee Retirement Income Security Act of 1974 (ERISA),[4] because of ERISA’s restrictions *577 on assignment and alienation of qualified trusts. 26 U.S.C. § 401(a)(13); 29 U.S.C. § 1056(d)(1). For the reasons set out below, we conclude that Congress did not intend Section 541(c)(2) to have the extensive reach urged by appellant-debtors and that ERISA’s anti-alienation provisions do not operate by their own force to shelter pension funds in bankruptcy.
Debtors, husband- and wife, filed a voluntary joint petition in bankruptcy, under Chapter 7 of the Code, on March 20, 1980. Pursuant to Section 522(b)(2)(A), 11 U.S.C. § 522(b)(2)(A), they elected to avail themselves of the state rather than the federal (11 U.S.C. § 522(d)) bankruptcy exemptions, presumably because of the high equity value of their homestead which could be retained under Texas law but not the federal law. Tex.Stat.Ann. art. 3833, 3836 (Vernon 1966 & Supp.1982-1983).[5]
The subjects of this appeal are the Goffs’ self-employed retirement trusts (Keogh Plan), administered by City National Bank pursuant to an ERISA-qualified pension plan.[6] At the time of the proceedings below, the Keogh trusts were valued at over $90,000, including a $2,878 contribution made by the Goffs only three days prior to declaration of bankruptcy.
The trust agreement provided:
Section XIII-MISCELLANEOUS
Neither the assets nor the benefits provided hereunder shall be subject to alienation, anticipation, assignment, garnishment, attachment, execution or levy of any kind, and any attempt to cause such benefits to be so subjected shall not be recognized, except to such extent as may be required by law.
No withdrawals were ever made although the trust agreement arguably granted Dr. Goff the right to withdraw funds prematurely, i.e., prior to either retirement, sale or termination of his business, or death, subject only to the ten percent tax penalty exacted by the Internal Revenue Code, 26 U.S.C. § 72(m)(5). The Goffs excluded these Keogh-trusts from the “property of the estate” to be relinquished in bankruptcy. 11 U.S.C. § 541.
After the creditors’ committee opposed a compromise proposed by the trustee in bankruptcy,[7] the bankruptcy court entered its Memorandum Order and Opinion from which this appeal was taken. The court denied the trustee’s application to compromise, and held that the corpus of both trusts were to be considered “property of the estate,” as they were not subject to the exclusion contained in Section 541(c)(2) of the Code, 11 U.S.C. § 541(c)(2), as property subject to restrictions on alienation enforceable under “applicable nonbankruptcy law.” We agree. Our examination of the Bankruptcy Code’s provisions and of discernible congressional intent reveals that applicable nonbankruptcy law was intended as a narrow reference to state “spendthrift trust” law and not as a broad reference to all other law, both federal and state, including ERISA.
*578 I.
A. “Property of the Estate”
The Bankruptcy Code was intended to create a more uniform and comprehensive scope to “property of the estate” which is subject to the reach of debtors’ creditors than had previously existed under the old Bankruptcy Act.[8] Under Section 70(a) of the earlier Act,[9] the inclusion of an asset within the estate varied in accordance with (1) an individual examination of the legal nature of the asset (2) in light of the purposes of the Bankruptcy Act. This two part test reflected the dual and often conflicting policies woven into the Act. These policies were to secure for the benefit of creditors everything of value the bankrupt might possess in alienable or leviable form, but to permit a bankrupt to accumulate new wealth after the date of his petition and to allow him an unencumbered fresh start. Relying upon these competing considerations, the Supreme Court developed a rule that where property “is sufficiently rooted in pre-bankruptcy past and so little entangled with the bankrupts’ ability to make an unencumbered fresh start ... it should be regarded as ‘property’ [of the estate].” Segal v. Rochelle, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). See Kokoszka v. Belford, 417 U.S. 642, 646, 94 S.Ct. 2431, 2434, 41 L.Ed.2d 374 (1974) (“[T]he crucial analytical key [is] not ... an abstract articulation of the statute’s purpose, but ... an analysis of the nature of the asset involved in light of those principles”); Lines v. Frederick, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); Nunnally v. Nunnally, 506 F.2d 1024 (5th Cir.1975) (finding that Navy retirement benefits, under applicable Texas law, were “property” in the bankruptcy estate). See also Lockwood v. Exchange Bank, 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903).
The enactment of the Bankruptcy Code undertook to obviate this analytical conundrum. Under Section 541 of the Code, all property in which a debtor has a “legal or equitable interest” at the time of bankruptcy comes into the estate, 11 U.S.C. § 541(a)(1), This is so “notwithstanding any provision [except as recognized in subsection (2)] that restricts or conditions transfer of such interest by the debtor.” Id. § 541(c)(1)(A). The sweeping scope of this automatic inclusion was intended to remedy much of the old Act’s perceived deficiencies: “[The Act was] a complicated melange of references to State law, and [did] little to further the bankruptcy policy of distribution of the debtor’s property to his creditor in satisfaction of his debts.” H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 175 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6136. See S.Rep. No. 95-989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5868.[10]
*579 B. Exemption and Exclusions
Of relevance to the question posed herein, two sections of the Code — Sections 522 and 541(c)(2) — permit a debtor to retain certain assets which would otherwise remain subject to the reach of his creditors. The property exempted pursuant to Section 522 initially enters the estate, and is subsequently excluded pursuant to the section’s provisions. By contrast, Section 541(c)(2) property never enters the estate.
1. Section 522: Exemptions
Section 522(b) permits a bankrupt a choice between a “federal” or “state” exemption system.[11] The debtor may elect to exempt either as the “federal” exemption the property set out in subsection (d) of Section 522 of the Code, or as the “state” exemptions the property specified as exempted under the law of his domicile, plus property exempted by “Federal law, other than subsection (d).” [12] The election choice of federal versus state exemptions is the debtor’s to make.[13] The choice, obviously, will hinge upon the debtor’s individual assessment of which exemption system would permit him to retain a larger share of his assets. This decision, in turn, will often depend upon the type of property held by the debtor, as state exemptions may vary in kind as well as degree from the federal bankruptcy exemptions.
In the immediate case, debtors selected the state exemption option, which does not provide in terms at least a partial exemption for Keogh plans as does the federal exemption. Under Section 522(d)(10)(E), 11 U.S.C. § 522(d)(10)(E), a debtor who elects the federal exemption may exempt his “right to receive a payment under a ... pension ... plan ... to the extent reason-' ably necessary for the support of the debtor and any dependent of the debtor,” unless the plan demonstrates three disqualifying characteristics.[14] The Goffs’ plans did not *580 contain the disqualifying characteristics and would have been covered by Section 522(d)(10)(E) to the extent “reasonably necessary” for the Goffs’ support.[15]
2. Section 541(c)(2): Exclusion
The second relevant code provision, Section 541(c)(2), is the focus of the immediate dispute. The claim of the Goffs is raised solely under this provision. Section 541(c)(1)(A) provides, with one caveat, that “any provision” “that restricts or conditions transfer” of property by the debtor is ineffective in bankruptcy to keep the property from becoming part of the estate. 11 U.S.C. § 541(c)(1)(A). The caveat situation, in which a restriction will keep property free from the estate, is set out in subsection (2):
(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title.
11 U.S.C. § 541(c)(2) (emphasis added). The Goffs claim that their ERISA-qualified[16] Keogh plans are excluded from the property of the estate by operation of this provision. The Goffs argue that the restrictions against assignment or alienation in their plans, included pursuant to ERISA, 26 U.S.C. § 401(a)(13)[17] and 29 U.S.C. § 1056(d)(1),[18] are “enforceable under applicable nonbankruptcy law” as that latter term was intended. We find, however, that Congress did not evidence an intent, by reference to “applicable nonbankruptcy law” to include an ERISA plan exemption. Rather, we find that Congress intended to exclude only trust funds in the nature of “spendthrift trusts” from the property of the estate.
In general terms, a spendthrift trust is a trust created to provide a fund for the maintenance of a beneficiary, with only a certain portion of the total amount to be distributed at any one time. The settlor places “spendthrift” restrictions on the trust, which operate in most states to place the fund beyond the reach of the beneficiary’s creditors, as well as to secure the fund against the beneficiary’s own improvidence. Although a given state’s nonban-kruptcy law of spendthrift trusts might afford protection to a particular pension trust, it is clear in the immediate case that appellant’s self-settled trust did not constitute a spendthrift trust entitled to exclusion under relevant state law.
*581 Our conclusion is reached through a three step analysis. First, we examine the explicitly narrow legislative intent behind the facially broad reference in Section 541(c)(2) to “applicable nonbankruptcy law.” Second, we consider the overall congressional scheme embodied in the Bankruptcy Code; particularly the exemption system election provision, Section 522, which directly addresses the degree to which pensions may therein be exempted and also explicitly references “Federal law” and ERISA. Third, we assess the relationship and effect upon ERISA of the intent of the Bankruptcy Code. The indicia of legislative intent, along with existing case law, lead to the inexorable conclusion that Section 541(c)(2)’s reference to “applicable nonbank-ruptcy law” was an acknowledgement of traditional state spendthrift trust law, and not of ERISA.
II.
A. “Applicable Nonbankruptcy Law”: Statutory Intent
The legislative history of Section 541(c)(2) indicates that Congress had something very specific in mind with its facially broad reference to “applicable nonbankruptcy law” as the benchmark for assessing the enforceability of trust restraints on alienation in bankruptcy. In its section-by-section analysis, the House Report accompanying their bill, H.R. 8200, explained:
Subsection (c) [of Section 541] invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become property of the estate.... Paragraph (2) of subsection (c), however, preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law.
H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 369 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6325 (emphasis added). Even more significant, in providing an overview comparison of the proposed Code to the old Act, the House Report said:
The bill also continues over the exclusion from property of the estate of the debt- or’s interest in a spendthrift trust to the extent the trust is protected from creditors under applicable State law.[19] The bankruptcy of the beneficiary should not *582 be permitted to defeat the legitimate expectations of the settlor of the trust.
Id. at 176, 1978 U.S.Code Cong. & Ad.News at 6136 (emphasis added).
The Senate Report, accompanying S. -2266, similarly explained that Section 541(c)(2) “preserves restrictions on a transfer of a spendthrift trust . .. enforceable [under] nonbankruptcy law.” S.Rep. No. 95-989, 95th Cong., 2d Sess. 83, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5869 (emphasis added). The Senate version of the Code, however, was dissimilar to that proposed by the House, in that it limited the extent to which Section 541(c)(2) property would be insulated from the estate, to that “reasonably necessary for the support of a debtor and his dependents.” Id.[20] This even narrower Senate version was rejected in the final enacted version, which followed the position taken in the House bill.[21]
In summary, from the legislative history of Section 541(e)(2), it is clear that Congress intended by its reference to “applicable nonbankruptcy law” to exempt from the estate only those “spendthrift trusts” traditionally beyond the reach of creditors under state law. This provision carries over from the old Act the previously recognized exemption for spendthrift trusts. See, eg., In re Witlin, 640 F.2d 661 (5th Cir.1981) (recognition, under the applicable prior Act, that spendthrift trusts were exempt pursuant to state.trust law).
B. The Overall Scheme and the Federal-State Exemption Election
The specific legislative intent behind Section 541(c)(2) is reinforced by a consideration of the overall congressional scheme embodied in the Bankruptcy Code. Appellant debtors argue for an expansive definition of “nonbankruptcy law” in Section 541(c)(2) to include federal laws which prohibit alienation. We find that the other provisions of the Code negate this intent because the Code explicitly makes reference to “federal law” or pension laws, including ERISA, when federal as opposed to state law is the subject of the reference.
The most telling example lies with Section 522 and its legislative history. As summarized above, Section 522 provides debtors a choice between the “state” or the “federal” exemption systems. If the “state” system is selected, a debtor may also exempt property pursuant to “Federal law other than subsection (d).” 11 U.S.C. § 522(b)(2)(A).[22] The Goffs, who made the state election, did not attempt to claim exemption of their ERISA-qualified Keogh plans under this other “Federal law” exemption.[23] The applicability of this exemption, therefore, is not directly involved in this appeal. Yet we do find a consideration of this provision helpful in understanding this case because we find that Congress did not intend to do ambiguously in Section 541 that which it clearly did not do directly in Section 522, although Section 522 explicitly addresses the extent to which other “Federal law” and retirement benefit exemptions would be recognized.
*583 The House and Senate Reports, in explanation of the other “Federal law” provision which was subsequently enacted in Code § 522(b)(2)(A), provide a list of illustrative property which might be exempted under federal laws other than the Bankruptcy Code:
Foreign Service Retirement and Disability payments, 22 U.S.C. 1104;
Social security payments, 42 U.S.C. 407; Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717; Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601;
Civil service retirement benefits, 5 U.S.C. 729, 2265;
Longshoremen’s and Harbor Workers’ Compensation Act death and disability benefits, 33 U.S.C. 916;
Railroad Retirement Act annuities and pensions, 45 U.S.C. 228(L);
Veterans benefits, 45 U.S.C. 352(E); Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and
Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175.
S.Rep. No. 95-989, 95th Cong., 2d Sess. 75, reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5861; H.Rep. No. 95-595, 95th Cong.2d Sess. 360 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6316. The reports provide no further insight into which other, if any, federal laws were intended to be brought within this provision’s scope.
The restrictive nature of the exemption listed is marked. Yet two recent cases have been decided in bankruptcy courts which reach diametrically opposite interpretations of the scope of this provision relative to ERISA-qualified pension plans. Compare In re Graham, 24 B.R. 305 (Bkrtcy.N.D. Iowa 1982) (not exempt under § 522(b)(2)(A)) with In re Hinshaw, 23 B.R. 233 (Bkrtcy.D.Kan.1982) (exempt under § 522(b)(2)(A)). In both cases, the bankruptcy courts were presented with ERISA-qualified retirement trusts, which contained provisions prohibiting assignment or alienation as required for qualification under the Act, 26 U.S.C. § 401(a)(13);[24] 29 U.S.C. § 1056(d)(1).[25] Similarly, in both cases, debtors selected the state exemption option, and then argued that the other “Federal law” exemption under the state election included ERISA.
In Graham, the court considered the listing of statutes in the legislative history, and concluded that Congress did not intend to include ERISA within the statutory exemption. First, the court reasoned, “[e]ven though ERISA was in effect at the time the Bankruptcy Code was debated and passed, ERISA is notably absent from the listing of other federal exemptions.” 24 B.R. at 311-12. Second, the court compared the federal laws listed in the legislative history with the ERISA provisions at issue and found them to be significantly distinguishable:
Congress, in providing for exemptions from creditors’ processes [in the listed federal laws], has been very explicit. The exemption for Civil Service Retirement benefits is illustrative:
The money mentioned by this subchap-ter is not assignable, either in law or equity ... or subject to execution, levy, attachment, garnishment, or other legal process, except as otherwise may be provided by Federal laws.
5 U.S.C. § 8346 (moved from 5 U.S.C. § 2265). In this provision Congress directly exempted the Civil Service Benefits from creditors. In contrast, ERISA only requires that the plan contain a restriction on alienation and assignment in order to qualify for ERISA tax benefits. That requirement is not an exemption from creditors’ process provided by federal law. If Congress had intended that ERISA would provide such an exemption, a provision similar to the provision quoted above could have been enacted. The fact that they did not do so leads this Court to conclude that an ERISA fund is not with-
*584 in the exemption from the bankruptcy estate provided by other federal law under § 522(b)(2)(A). See In re Watson, 13 B.R. 391 (Bkrtcy.M.D.Fla.1981).
Id. at 312.
By contrast, the court in Hinshaw, after examining the same congressional list of representative federal laws, concluded that ERISA-qualified plans were covered by the exemption. While the Hinshaw court similarly undertook an analysis of the statutory provisions cited by Congress, it reached a different conclusion and relied upon different statutes than did the Graham court. The Hinshaw court began its analysis by reasoning:
Many of the statutes that have been recognized as giving rise to a federal exemption of the type here being considered may be characterized as nothing more than prohibitions against assignment or alienation. For example, 22 U.S.C. § 1104 of the Foreign Service Act of 1946 provides:
None of the moneys mentioned in this title (citations omitted) shall be assignable either in law or equity, or be subject to execution, levy, attachment, garnishment, or other legal process....
The parallel provision of the Social Security Act, 42 U.S.C. § 407 reads:
The rights of any person to any future payment under this title shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment or other legal process, or to the operation of any bankruptcy or insolvency law.
Although ERISA plan funds are not specifically mentioned in the House Report, the similarity between the provisions of those statutes that are recognized as constituting a federal exemption and the provisions of 29 U.S.C. § 1056, 26 U.S.C. § 401(a)(13) (and the accompanying Treasury Regulation) supports a conclusion that a federal exemption for ERI-SA plans was intended.
23 B.R. at 235.[26] Further, it found the analysis of the court in Commercial Mortgage Insurance Inc. v. Citizens National Bank of Dallas, 526 F.Supp. 510 (N.D.Tex. 1981) persuasive.[27] While the issue in that case was whether ERISA precluded non-bankruptcy garnishment of pension benefits, the Hinshaw court found the reasoning applicable:
In Commercial Mortgage, the court noted the legislative intent [of ERISA] is to ensure that benefits are available for retirement purposes. Id. at 518. To allow a creditor to garnish these plans would undermine the protection that Congress intended to give to the plan beneficiaries. A similar analysis of the intended effect of the federal exemption in bankruptcy results in the conclusion reached here.
23 B.R. at 236. Thus the court in Hinshaw concluded that tax-qualified ERISA plans were exempt under 11 U.S.C. § 522(b)(2)(A).
A careful evaluation of this issue leads us to the result reached by the bankruptcy *585 court in Graham. We find that Congress did not intend to include ERISA-qualified plans among those “exempt under Federal law,” pursuant to 11 U.S.C. § 522(b)(2)(A).
The failure of Congress to include ERISA in its listing of illustrative federal statutes is highly probative of congressional intent that ERISA was not within the group of “federal law” based exemptions. ERISA, a comprehensive and much-debated statute with sweeping coverage was enacted in 1974; the House and Senate reports on the subsequently enacted Bankruptcy Code Section 522(b)(2)(A) were issued in 1977 and 1978, respectively. Congress knew of the previously-enacted ERISA when drafting Section 522(b)(2)(A), yet neither the House nor the Senate deemed fit to include it within their respective illustrative lists. Congress did refer to ERISA where it wanted to do so in other provisions of the Code. Of similar relevance is the specific reference in another subsection of Section 522 itself to the very ERISA provision relied upon by appellants as constituting a “Federal law” exemption. 11 U.S.C. § 522(d)(10)(E)(iii) (reference to pension benefit exemption when the federal exemptions are elected by the debtor). See also H.Rep. No. 95-595, 95th Cong., 2d Sess. 455 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6411.
Certainly, therefore, Congress did not “overlook” ERISA. Given the extensive and general reach of ERISA-qualified plans, it is highly improbable that Congress intended their inclusion without mention in the Section 522(b)(2)(A) exemption in the midst of a listing of significantly less comprehensive and less well known statutes. The often-stated admonition that it may be treacherous to attach great weight to congressional silence in interpreting its laws does not apply in this case in light of the comprehensive consideration of this issue which is revealed by this history.
Further, we stress that ERISA’s anti-assignment and alienation provisions are different in kind from those contained in the statutes listed in the Code’s legislative history. We do not see across-the-board differences in the explicitness of the restraints against alienation in the listed statutes and in ERISA.[28] But we do find that the contingent nature of ERISA’s restraints on alienation differs markedly from the absolute prohibitions contained in the listed statutes. ERISA merely provides that as a condition of obtaining qualified status —with its attendant tax and other benefits — a pension plan must preclude alienation or assignment of its benefits. It does not prohibit pension funds from permitting alienation or assignment; rather, while it encourages and favors qualified plans, it envisions that “disqualified” plans may be formed which are still subject to ERISA’s regulatory scheme but which do not restrict alienation or assignment. By contrast, the listed statutes which establish or guarantee certain benefits directly preclude all such benefits from alienation or assignment.[29]
As additional reenforcement of our view of the Section 522 exemptions, we find that “property” covered by ERISA differs in *586 nature from that covered under the enumerated statutes. While it is true that ERISA and the cited statutes share the common denominator of “pension and welfare” benefits, the private pension and welfare benefits sweepingly regulated by ERISA[30] differ considerably from the public funded and/or created pension and welfare systems,[31] or the few exceptional, traditionally guarded industries[32] covered by the illustrative listings. We believe that these latter, narrow characteristics of the cited statutes, rather than the broad, common trait of private pension and welfare legislation, was intended as the operative thread by which other federal statutes — overlooked or yet to be enacted — might be included. Thus, we conclude that Congress did not intend to include ERISA-qualified plans within the other “Federal law” exemption of the Section 522 election provision.
C. “Applicable Nonbankruptcy law” under Section 541 and ERISA
Flowing out of this discussion is clear indication of a congressional intent that Section 541(c)(2) — the exemption relied upon by the Goffs’ on appeal — was never intended to include ERISA in its reference to “applicable nonbankruptcy law.” Congress made reference to federal law and pension benefits when such a characterization was intended; yet it did not do so in Section 541(c)(2). As we have pointed out above, Congress while well aware of ERI-SA, specifically considered the role of pension benefits in bankruptcy proceedings in Section 522, and did not grant a broad exemption. The only reasonable inference to draw is that Congress intended that pensions provided for by federal law be insulated from bankruptcy only to the extent recognized in Section 522. While pensions might be excludable from the property of the estate pursuant to Section 541(c)(2), the state law exemption, their exclusion under that section is provided solely by state spendthrift trust law and not by the operation of ERISA.[33]
It is well to make a final telling observation on the relationship between *587 ERISA and the Bankruptcy Code. While ERISA preempts state law, 29 U.S.C. § 1144(a), it clearly was not intended to affect the operation of other federal law. It provides: “Nothing in this [Act] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States [except pre-existing federal pension law] or any rule or regulation issued under such law.” 29 U.S.C. § 1144(d). As we have already discussed, the Bankruptcy Code was, generally, intended to broaden the “property of the estate” available to creditors in bankruptcy and, specifically, intended to limit any exemption of pension funds. These policy-based provisions of the Code would be frustrated were ERISA’s anti-alienation and assignment provisions applied with a sweeping brush. Thus, ERISA’s specific provision precluding interference with the operation of federal law renders the Bankruptcy Code effective over any ERISA provisions to the contrary.
Having reached this conclusion we must nevertheless stop short of an arbitrary interpretation urged by the .trustee in bankruptcy. The trustee argues that the inclusion in Section 522(d) of a pension benefit exemption, 11 U.S.C. § 522(d)(10)(E), for those making a federal election, negatives any congressional intent to include any ER-ISA pensions at all within the ambit of Section 541. The trustee reasons that the Section 522(d)(10)(E) exemption would be surplusage if Section 541 had the effect of keeping all possible ERISA-qualified plans from ever entering the estate.[34] While, as set out above, we find the wording and breadth of Section 522 enlightening of congressional intent for other reasons, we cannot agree with appellees’ proffered construction. Section 522(d)(10)(E) reaches a broad array of employment benefits,[35] and exempts both qualified and unqualified pension plans, to the extent such benefits are reasonably necessary for the support of debtor and his dependents. Given this much broader exemption of benefits available only to those making a federal election, we find no reason to doubt that ERISA-qualified pension funds are included in Section 541 if they qualify as spendthrift trust plans under state law. Cf. In re Threewitt, 24 B.R. 927, 930 & n. 4 (D.Kan.1982) (reasoning that Section 522(d)(10)(E) is broader than Section 541, and that it is not “remarkable that Congress did not bother to further complicate an already complex code by taking pains to insure that there was no overlap” between sections). We thus conclude that Section 522(d)(10)(E) does not preclude consideration of qualified pension plans under the Section 541 exclusion provision so long as they qualify as a “spendthrift trust” under the applicable state law.
III.
We have now concluded that Section 541(c)(2) was intended to exempt only “spendthrift trust” assets from the bankruptcy estate. We now consider whether the Goffs’ Keogh plans can fall within the spendthrift trust definition. The general rule is well established that if a settlor creates a trust for his own benefit and inserts a “spendthrift” clause, restraining alienation or assignment, it is void as far as creditors are concerned and they can reach the settlor’s interest in the trust. In re Witlin, 640 F.2d 661, 663 (5th Cir.1981) (see also the cases and treatises cited therein). This general proposition is the law in Texas, which in this case provides the “applicable nonbankruptcy law.” See, e.g., Bank of Dallas v. Republic National Bank of Dallas, 540 S.W.2d 499 (Tex.Civ.App. — Waco 1976, writ ref’d n.r.e.); Glass v. Carpenter, 330 *588 S.W.2d 530 (Tex.Civ.App. — San Antonio 1959, writ ref’d n.r.e.); Long v. Long, 252 S.W.2d 235 (Tex.Civ.App. — Texarkana 1952 writ ref d n.r.e.). See also In re Howerton, 21 B.R. 621, 622 n. 1, supplemented, 23 B.R. 58 (Bkrtcy.N.D.Tex.1982).
Our reasoning in the Witlin case is persuasive. There we held that self-settled Keogh plans were not exempt under the spendthrift trust provision of the old Bankruptcy Act. We said: “There is ... a strong policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors.” 640 F.2d at 662. See Glass v. Carpenter, 330 S.W.2d 530, 534 (Tex.Civ. App. — San Antonio 1959, writ ref d n.r.e.). Here, as in Witlin, appellant-debtors attempted such a revokable trust for their own benefit. They retained the freedom to withdraw their Keogh plan assets, yet purported to insulate those assets from their creditors.[36] If this dichotomous treatment were to be recognized, the strong common law policy of spendthrift trusts, as well as the Bankruptcy Code’s intent, would be subverted. Debtors could shelter funds in Keogh plans immediately before declaring bankruptcy — as did the Goffs with at least some of their funds — and immediately after discharge of all debts withdraw such funds for their own benefit.[37] Whatever might be the rule in a nonbankruptcy setting involving ERISA’s provisions[38] we hold that neither law nor equity would afford self-settled Keogh plans “spendthrift trust” exemption in bankruptcy.[39]
Finally, appellants argue that reliance upon traditional spendthrift trust law results in disparate treatment of self-employed and employer-created pension trusts which, in turn, offends both law and reason. Appellants contend that since ERISA requires that all qualified plans include restraints on alienation, and its provisions extend equally to guarantee all workers the benefits of their contributions in retirement years, distinctions in bankruptcy exemption status according to employment status would conflict with ERISA’s statutory intention to treat all retirement plans the same way. Further, the Goffs argue, since employees may quit their employment post-bankruptcy and thus be entitled to withdraw their pension contributions under ER-ISA, any bankruptcy distinction made on the basis of the revokable, self-settled nature of self-employed pension plans is arbitrary.
*589 We are not persuaded by appellants’ arguments. In analyzing the effectiveness in bankruptcy of spendthrift provisions in pension plans, the courts have generally concluded that those contained in employer-created plans were effective[40] similar provisions in self-settled plans were not.[41] The latter conclusion is inescapable since, as discussed earlier, the traditional law of spendthrift trusts has rejected the notion of effective spendthrift provisions in self-settled trusts. As to the former, without passing upon the exact limits of plans which could properly be characterized “spendthrift trusts,” the employer-created-and-controlled nature of those plans may well make them analogous to a spendthrift trust.
We find that this difference is contrary to neither law nor logic. First, whether or not ERISA bestows equal treatment upon both types of plans is not at issue. As discussed previously, ERISA was not intended to affect the operation of other federal laws including federal bankruptcy laws. If a distinction is created by operation of bankruptcy law, which might conflict with ERISA, bankruptcy law prevails. Even assuming arguendo that the court-drawn distinction conflicts with federal pension law, it is nonetheless enforceable if valid under federal bankruptcy law.
Second, we disagree with appellants’ characterization that the degree of beneficiary control over both types of pension plans is indistinguishable, thus rendering their separate treatment unreasonable. Under appellants’ self-employed Keogh plans considerable control, including withdrawal authority, was retained. The only limitation upon withdrawal was a ten percent tax penalty. We find this to be significantly different from the usual case of employer-created funds in which the beneficiary employee has little or no control during the term of his employment, and may only withdraw funds upon termination of employment. He must quit his job in order to gain premature access to his retirement funds. We cannot equate a “tax penalty” with “employment termination” as equal restraints upon withdrawal of pension funds.[42] We thus find the court-drawn distinction a reasonable one, and appropriately made under the Bankruptcy Code.

In Conclusion

After considering the legislative history of Section 541(c)(2) specifically, and of the Bankruptcy Code generally, as well as the statutory framework within which Section 541(c)(2) appears, it is apparent that Congress did not intend by reference to “applicable nonbankruptey law” to exempt ERI-SA-qualified pension plans from the bankruptcy estate by virtue of ERISA’s provisions precluding assignment or alienation. Rather, it is clear that Congress intended a limited exemption for “spendthrift trusts,” as defined by reference to state law. Since we find that the self-settled Keogh plans at issue do not qualify as “spendthrift trusts” under state law, we affirm the bankruptcy court’s inclusion of the pension trusts in the bankrupts’ estate.
AFFIRMED.

. We have jurisdiction of this direct appeal from the bankruptcy court’s order, pursuant to 28 U.S.C. § 1293(b), which provides for such appeal upon agreement of the parties. See In re Kutner, 656 F.2d 1107 (5th Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

. These plans are established pursuant to the Keogh-Smathers Act, Pub.L. No. 87-792, 76 Stat. 809 (1962) (codified in scattered sections of the I.R.C.).

. 11 U.S.C. § 541(c)(2) provides:
(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

. Pub.L. No. 93-106, 88 Stat. 898 (codified in 29 U.S.C. §§ 1001-1144, and in scattered sections of the I.R.C.).

. See generally In re Cannady, 653 F.2d 210 (5th Cir.1981). The more specific role of this election, within the context of both the Code’s statutory scheme and the issue before us, is discussed infra.
The bankruptcy court found that while debtors did not affirmatively announce their state election, that election was obvious, given the equity value of the homestead. Further, the court concluded that, insofar as the- pension trusts might have been subject to federal exemption under § 522(d)(10)(E), had debtors so elected, debtors failed to list these trusts as required by § 522(1). Hence they had waived any claim to the federal exemption option. The parties do not challenge these findings on appeal.

. Apparently, the Goffs’ Keogh assets were contained in two different trusts, or accounts, although subject to a single set of agreements: a master retirement plan and trust agreement. The accounts were in the name of “E. Wayne Goff.”

. On January 15, 1981, the trustee filed an application with the bankruptcy court to accept $2,000 in full settlement of the claims of the estate against the Goffs’ Keogh plans. After the creditors’ committee filed its opposition to the trustee’s application, the bankruptcy court held a hearing, considered the briefs and arguments of counsel, and took the case under advisement.

. See S.Rep. No. 95-989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5868; H.Rep. No. 95-595, 95th Cong., 2d Sess. 175 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6136.

. Section 70(a)(5) of the Bankruptcy Act formerly provided that
(a) The trustee of the estate of a Bankrupt ... shall ... be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition [to] ... (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered....

. The Senate Report, in explanation of the broadened scope of § 541 of the Code, over § 70 of the Act, explained that the subsequently enacted Code provision “has the effect of overruling Lockwood v. Exchange Bank, 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903), because it includes as property of the estate all property of the debtor, even that needed for a fresh start. After the property comes into the estate, then the debtor is permitted to exempt it....” S.Rep. No. 95-989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5868 (footnote omitted). The Report also concludes that the provision overrules Lines v. Frederick, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Id. See also Regan v. Ross, 691 F.2d 81, 83-84 (2d Cir.1982); 4 Collier on Bankruptcy j| 541.02[1], at 541-9 to -12 (15th ed. 1982).
While the existence of a “legal or equitable interest” may turn upon state nonbankruptcy law, once it is determined that such an interest exists, it automatically becomes property of the estate under § 541 of the Code.

. Section 522(b) provides:
(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate either—
(1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph 2(A) of this subsection specifically does not so authorize; or, in the alternative,
(2) (A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor’s domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place; and
(B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

. This provision is discussed in detail later. Its language and intended breadth provide support for the explicit, although meager, congressional intent in enacting § 541(c)(2).
Its guarantee of state plus other “federal law” exemptions under the state election option precludes the states from prohibiting the latter exemptions under § 522(b)(1). See note 13 infra.

. Two caveats to this general proposition should be noted. First, a state may prohibit a federal § 522(d) election for its domiciliaries, leaving its debtors with only the state exemption option. 11 U.S.C. § 522(b)(1). See In re McManus, 681 F.2d 353 (5th Cir.1982), 3 Collier on Bankruptcy 1Jj[ 522.02, at 522-11 to -12, and 522.09, at 522-37. Texas, the state of debtors’ domicile, has not enacted such legislation. See In re Cannady, 653 F.2d 210, 214 (5th Cir.1981). Second, the Bankruptcy Code envisions the possibility that a bankrupt, having made an improvident election, may petition to obtain relief, or have his election choice changed for him by the courts on their own motion, in the interest of justice. See, e.g., H.Rep. No. 95-595, 95th Cong., 2d Sess. 360 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6316.

. Section 522(d)(10)(E) provides that a debtor may exempt (emphasis added):
(E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—
(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor’s rights under such plan or contract arose;
(ii) such payment is on account of age or length of service; and
(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), 408, or *580 409 of the Internal Revenue Code of 1954 (26 U.S.C. 401(a), 403(a), 403(b), 408, or 409).
Since a plan must exhibit all three of the above traits to be ineligible for § 522(d)(10)(E) exemption, the exemption provision has a broad reach. Provided that the plan does not fall within both subsections (i) and (ii), the plan would be subject to exemption whether or not it was (iii) an ERISA and Internal Revenue Code “qualified” plan. See, e.g., In re Threew-itt, 24 B.R. 927, 929-30 & n. 4 (D.Kan.1982).

. The factors considered by the courts in determining what amounts are “reasonably necessary for ... support” include, for example, age, health, future earnings capacity, necessary expenditures. See In re Kochell, 26 B.R. 86 (Bkrtcy.W.D.Wisc. 1982). Compare In re Clark, 18 B.R. 824 (Bkrtcy.E.D.Tenn.1982) (case involving young doctor and not presenting extenuating circumstances, was not appropriate for § 522(d)(10)(E) application) with In re Donaghy, 11 B.R. 677 (Bkrtcy.S.D.N.Y.1981) (case involving 62 year-old unemployed debtor with emphysema and 64 year-old wife with cancer, and large medical bills, was appropriate for § 522(d)(10)(E) exemption).

. The parties have not questioned the plan’s ERISA-qualified status. Although an argument might have been made that the debtors’ plan was not qualified, given debtors’ limited right of withdrawal and control over plan funds, we must accept for purposes of this appeal that the plan was qualified and thus subject to ERI-SA’s anti-alienation provisions. Congress has committed the determination of qualification, in the first instance, to the Commissioner of Internal Revenue, and it would therefore be inappropriate for us to pass upon this question. See In re Baviello, 12 B.R. 412, 416 n. 5 (Bkrtcy. E.D.N.Y.1981).

. 26 U.S.C. § 401(a)(13) requires, in relevant part, that in order to be tax-qualified, a pension trust must “provide[] that benefits provided under the plan may not be assigned or alienated.”

. 29 U.S.C. § 1056(d)(1) provides: “Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.”

. The House Report cited, in comparison, the Report of the Commission on the Bankruptcy laws of the United States, H.R.Doc. No. 93-139, 93d Cong., 1st Sess., pt. I, at 197-98 (1973), reprinted in 2 Collier on Bankruptcy (Appendix) I — 1, 197-98 (15th ed. 1982). The Commission was established by P.L. 91-354, and its draft statute was the focus of all subsequent activity surrounding the. revision of the bankruptcy laws, until .the introduction of H.R. 6, by Congressman Don Edwards, on January 4, 1977. H.R. 6 was the immediate precurser of the bill that ultimately became the Bankruptcy Code. 2 Collier on Bankruptcy (Appendix) 1-1 (15th ed. 1982). The referenced passage is illuminating and reinforces the already-apparent House intent that § 541(c)(2) be directed narrowly towards traditional “spendthrift” trusts:
5. Spendthrift Trusts
Under the existing Act, the trustee does not succeed to beneficial interests subject to spendthrift restraints. This is so since the present Act requires that the interests be alienable or amenable to creditors’ process under local law and, by definition, such interests are not. There is no sound justification for permitting 6 debtor to take advantage of the Bankrupt Act and, at the same time, to shield from his creditors assets because local law does not allow creditors to reach his interest. The Commission generally recommends that these restraints not be enforceable. However, in recognition of the possibility that the spendthrift trust may be used to protect one incapable of providing for his own welfare, the debtor should be allowed to retain sufficient income to support himself and his dependents. But to the extent the beneficial interest is of a value in excess of the reasonable support needs of the debtor and his dependents, the interest should be available to the debtor’s creditors.
(footnotes omitted). As discussed infra, the Commission’s reoommended limitation on the spendthrift trust exemption, to the extent of “reasonable support,” was incorporated in the rejected Senate version but excluded in the House version which was adopted in the enacted Code. See 124 Cong.Rec. H11089, 11096 (daily ed. Sept. 28, 1978), reprinted in 1978 U.S.Code Cong. Si Ad.News 6436, 6455 (statement by the Horn Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, upon introducing the House Amendment to the Senate Amendment to H.R. 8200).

. The Senate version mirrors the concerns expressed in Bankruptcy Commission’s Report, see note 19 supra. See also Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93-139, 93d Cong., 1st Sess., pt. I, at 193 (recommending that “spendthrift trust” provisions be enforceable only to the extent “reasonably necessary for ... support”), 227 n. 88. (explaining that this “correlates the treatment of [the spendthrift trusts] with that of the exemption of retirement benefits [in the precurser to federal election option of § 522(d)(10)(E), see pt. II at 125 and 129] and pt. II at 153 (1973), reprinted in 2 Collier on Bankruptcy (Appendix) 1-1 (15th ed. 1982).

. The House bill, H.R. 8200, was passed in lieu of the Senate Bill, H.R.S. 2266, after amendments containing much of the Senate bill’s language. See 1978 U.S.Code Cong. & Ad.News 5787, 5787.

. See the discussion at notes 11-15 supra. Presumably, if a federal, subsection (d), election is made, the other “Federal law” exemptions operate by their own force. The result is that both federal and state electors are granted the exemption benefits of these other laws.

. As concluded, infra, it appears that this claim would have been unsuccessful as ERISA-qualified plans are not covered by the other “Federal law” exemption in § 522(b)(2)(A).

. See note 17 supra.

. See note 18 supra.

. The Treasury Regulation referenced in the above-quoted passage, 26 C.F.R. § 1.401(a)-13(b)(1) (1982), interprets § 401(a)(13) and provides a more expansive definition of the Revenue Code’s prohibition against assignment or alienation than does the bare-bones language of the Code. The interpretative regulation provides that, in order for a plan to obtain tax-qualified status, it must provide that benefits may not be “anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process.” 26 C.F.R. § 1.401(a) — 13(b)(1) (1982).

. Commercial Mortgage, which is also relied upon by appellant-debtors, involved a medical doctor-debtor beneficiary who participated in both a profit-sharing and a pension plan through his professional association. At the time of the attempted garnishment, the doctor ■was the sole shareholder and director of the professional association and the sole trustee of the plans, although other employees participated in the plans. The court examined the ERISA antirassignment and alienation provisions at issue in the immediate case, within the context of a state law-based, nonbankruptcy garnishment attempt and concluded that ERI-SA precluded the creditors from reaching the ERISA qualified plans. •

. It is obvious, merely by contrasting those statutes quoted in support of the courts’ divergent conclusions in Graham and Hinshaw, that the listed statutes vary in their explicit mandates against prohibition. Further, whatever deficiencies might be attributed to ERISA’s terse recitations, in 26 U.S.C. § 401(a)(13) and 29 U.S.C. § 1056(d)(1), at least those of the ERISA’s tax provisions have been cured by virtue of the Treasury Department’s interpretative regulation. See note 23 supra.

. These statutes, in the order listed by Congress, provided in pertinent part: 22 U.S.C. § 1104 (now codified at 22 U.S.C. § 4060) (“None of the moneys ... shall be assignable ... or subject to execution, levy, attachment, garnishment, or other legal process ... ”); 42 U.S.C. § 407 (“The right ... to any future payment ... shall not be transferable or assignable ... and none of the moneys ... shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.”); 42 U.S.C. § 1717 (same wording); 46 U.S.C. § 601 (“No wages ... shall be subject to attachment ...”); 5 U.S.C. §§ 729, 2265 (now codified at 5 U.S.C. § 8346) (“The money [covered herein] is not assignable ... or subject to execution, levy, attachment, garnishment, or other legal process ... ”); 33 U.S.C. § 916 (“No assignment, release, or commutation of compensation or benefits ... shall be valid, and such compensation or benefits shall be exempt from all claims of creditors and from levy, execution, and attachment or other reme *586 dy for recovery or collection of a debt ... ”); 45 U.S.C. § 2281 (now codified at 45 U.S.C. § 231m) (“Notwithstanding any other [federal or state law], no annuity or pension payment shall be assignable or be subject to ... garnishment, attachment, or other legal process under any circumstances whatsoever ... ”); 45 U.S.C. § 352(e) (same wording); 38 U.S.C. § 3101 (“Payment of benefits ... shall not be assignable ... and ... shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever ... ”); 43 U.S.C. § 175 (repealed) (“No [homestead] lands ... shall in any event become liable to the satisfaction of any debt contracted prior to the issuing of a patent therefor”).

. The entire scope of ERISA applies only to pension plans, although welfare and benefit plans are also covered by the Act. These latter plans may cover any variety of fringe benefits including medical disability payments. 29 U.S.C. § 1002(1).

. These would include the foreign service retirement and disability payments, social security payments, injury or death compensation payments from war risk hazards, civil service retirement benefits, Longshoremen’s and Harbor Workers’ Compensation Act death and disability benefits, Railroad Retirement Act annuities and pensions, veterans benefits, special pensions paid to winners of the Congressional Medal of Honor, and federal homestead lands on debts contracted before issuance of the patent.

. These would include the wages of fishermen, seamen, and apprentices, as well as the Longshoremen’s and Harbor Workers’ Compensation Act disability benefits. Cf. Socony Vacuum Oil Co. v. Smith, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939) (“seamen are the wards of the admiralty”).

. We also note the congressional use of the term “applicable nonbankruptcy law” as governing the state election exemption for property held in joint tenancy or tenancy by the entirety, see note 11 supra. The courts have interpreted this analogous reference to “applicable nonbankruptcy law” as a reference to state law. See, e.g., Napotnik v. Equibank & Parkvale Savings Ass’n, 679 F.2d 316, 318 (3d Cir.1982); Ragsdale v. Genesco, Inc., 674 F.2d 277 (4th Cir.1982). The reasoning behind these cases is not wholly applicable to the case at hand because the only law defining such property interests is state law. So these interpretations are not dispositive of the “applicable non-bankruptcy law” referenced under § 541(c)(2), but they do support the outcome reached here.

. “It is well established that a statute should be construed so that each of its provisions is given full effect; interpretations which render parts of a statute inoperative or superfluous are to be avoided.” Duke v. University of Texas, 663 F.2d 522, 526 (5th Cir.1981) (citing Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973)).

. Accord, In re Threewitt, 24 B.R. 927, 930 (D.Kan.1982) (benefits covered under § 522(d)(10)(E) would include Christmas stock bonuses paid upon 25 years of service, profit-sharing plans restricted to senior employees, and annuities to provide income to industrially-disabled workers).

. As to our assumption that the Goffs’ plan was qualified, although they maintained a right to withdraw funds in apparent contravention of ERISA’s anti-alienation provisions, see note 16 supra.

. Exercise of this right is subject only to a ten percent tax penalty under the Internal Revenue Code.

. As discussed earlier, ERISA’s provisions supersede state law, 29 U.S.C. § 1144(a), but not other federal law, 29 U.S.C. § 1144(d). Thus, any rule derived in a state nonbankruptcy proceeding, effected by ERISA’s provisions, would not have general application in federal bankruptcy proceedings.
Appellant debtors heavily, and erroneously, rely upon one such nonbankruptcy rule, set out in Commercial Mortgage Insurance Inc. v. Citizens National Bank of Dallas, 526 F.Supp. 510 (N.D.Tex.1981). See note 27 and the accompanying discussion supra. In that case, the district court held that debtors’ Keogh plans, subject to ERISA-based restraints on alienation, were insulated from the reach of their creditors. As we conclude above, ERISA restraints do not apply by their own force in the context of federal bankruptcy proceedings. The question addressed in Commercial Mortgage — of ERISA’s preclusion of state creditors’ from attaching pension funds — is inapposite. But cf. In re Threewitt, 24 B.R. 927, 929 (D.Kan.1982) (employer operated fund was beyond reach of general creditors, and thus exempt under § 541(c)(2) from bankruptcy creditors).

. As in Witlin, we find it irrelevant that appellant-debtors have not yet withdrawn any funds from their Keogh plans. Similarly, we need not concern ourselves with the parties’ arguments pertaining to the Goffs’ motives in establishing the Keogh plans, i.e. merely for tax-shelter purposes versus as a fraud on creditors. The Goffs’ motives are irrelevant, lest all debtors— whether innocently or fraudulently motivated — be granted a windfall contrary to all discernible law and policy. Cf. In re Reed, 700 F.2d 986 (5th Cir.1983) (intent to defraud in prebankruptcy conversion of nonexempt into exempt assets relevant to question of whether to grant discharge).

. See, e.g., In re Turpin, 644 F.2d 472 (5th Cir.1981) (under old Act, not property of estate); In re Parker, 473 F.Supp. 746 (W.D.N.Y. 1979) (under old Act, not property of estate); In re Threewitt, 24 B.R. 927 (Bkrtcy.D.Kan. 1982).

. See, e.g., In re Witlin, 640 F.2d 661 (5th Cir.1981); In re Graham, 24 B.R. 305 (Bkrtcy. N.D.Iowa 1982) (where debtor was sole shareholder and beneficiary of professional corporation pension fund, settlor and beneficiary same); In re Howerton, 21 B.R. 621, supplemented 23 B.R. 58 (Bankr.N.D.Tex.1982); In re Clark, 18 B.R. 824 (Bkrtcy.E.D.Tenn.1982); In re Watson, 13 B.R. 391 (Bkrtcy.M.D.Fla.1981) (ERISA-qualified self-settled cooperative investment plan); In re Baviello, 12 B.R. 412 (Bkrtcy.E.D.N.Y.1981).

. We leave open the question of whether an appropriate case might be presented in which the restrictions upon a settlor-beneficiary’s control and withdrawal of funds in a self-settled trust would ever render effective a spendthrift clause under applicable state law. Consider, for example, a restriction that would condition premature withdrawal upon a self-employed individual’s sale of his business or career change.